**Cotey WYNN, Rodney Bennett, and Joshua Ross, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 08–CF–1166, 08–CF–1167, 08–CF–1168.

District of Columbia Court of Appeals.

Argued March 28, 2012.
Decided July 19, 2012.

Lee R. Goebes, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant Rodney Bennett.

Jonathan Zucker, Brooklyn, NY, appointed by the court, for appellant Joshua Ross.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time, and Michael C. Liebman, Assistant United States Attorney, were on the brief, for appellee.

Before FISHER and OBERLY, Associate Judges, and WAGNER, Senior Judge.

**1.** Appellants were each acquitted of the first-degree murder of Damon Clark, D.C.Code §§ 22–2101, –4502 (2001); possession of a firearm during a crime of violence, D.C.Code § 22–4504(b) (2001); and conspiracy to commit murder, D.C.Code §§ 22–1805a, –2101 (2001). Mr. Ross was acquitted of carrying a pistol without a license ("CPWL"), D.C.Code § 22–4504(a) (2001), and Mr. Bennett was acquitted of CPWL by a prior felon, D.C.Code § 22–4504(a)(2) (2001).

FISHER, Associate Judge:

Although they were acquitted of murdering Damon Clark,[1] appellants Rodney Bennett, Joshua Ross, and Cotey Wynn were convicted of obstructing justice, in violation of D.C.Code § 22–722(a)(6) (2001).[2] Because appellants' conduct did not amount to obstructing "the due administration of justice in any official proceeding," we reverse their convictions for obstruction of justice. However, we affirm Mr. Wynn's separate conviction for carrying a pistol without a license ("CPWL").[3]

## I. Facts

Just before midnight on April 19, 2004, Metropolitan Police Department ("MPD") Officers Eric Hairston and Charles Marshall were patrolling in the Trinidad neighborhood when they heard the sound of gunshots. Within fifteen seconds, they responded to Penn Street and Montello Avenue, an area where other officers found Damon Clark lying in the street, mortally wounded.

Officer Marshall immediately spotted a man, later identified by witnesses as appellant Joshua Ross, crouching next to a burgundy Buick. When Officer Marshall ordered Ross to "[c]ome out, show your hands," Ross instead fled toward the apartment of Fayetta Goodwine on Penn Street. While Officer Marshall chased Ross, Officer Hairston approached the burgundy Buick and found a black 9–mm Glock pistol on top of the front passenger's

**2.** D.C.Code § 22–722(a)(6) provides that:

(a) A person commits the offense of obstruction of justice if that person: ...
(6) Corruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding.

**3.** D.C.Code § 22–4504(a)(2) (2001).

side tire, next to where Ross had been crouching.[4]

Ms. Goodwine was returning home when she saw Ross crouching next to the Buick and then running from the police. Goodwine entered her apartment, and within minutes Ross, Bennett, and Wynn, all of whom she knew, came in through the front and back doors. One of the police officers yelled for someone to "open the door," but when Goodwine attempted to comply, Bennett pushed back on the door. "He just shut the door and the police had to wrestle him with the door." After Bennett closed the door, the police did not attempt to enter the apartment.

Ms. Goodwine turned to appellants and asked if they had "anything in my house," meaning "anything that would, you know, ... get me in [ ] trouble." None of them responded, and Wynn and Ross left the room. However, once Bennett and Goodwine were alone, Bennett admitted "that they did have something in there."

Goodwine went into her bedroom, where she found Wynn and Ross. Wynn was putting a gun into an opaque bag; Ross, meanwhile, was reaching for the bag. Goodwine told appellants, "if y'all got anything in here, let me know, let's get it out here because I didn't want to go to jail or lose my apartment behind it." Ross then asked Goodwine if he could go upstairs with her to the apartment of Goodwine's nieces. Goodwine told Ross no, and took the bag with the gun. She went upstairs alone and hid the bag in her nieces' bathroom. Police never recovered the weapon.[5]

The police made no arrests that night. Inside a Toyota Camry parked near where Damon Clark had been killed, police recovered a .45–caliber Hi–Point handgun with a bullet stuck in its barrel. An officer was able to fire the weapon after he pushed out the projectile and pulled back the slide, ejecting the casing. During his opening statement and closing argument, Wynn's counsel admitted that the gun belonged to Wynn, but contended that it was inoperable.

At trial, the government argued that the obstruction of justice charges were for "the hiding of the guns. Defendant Ross hides a gun under the car under the Buick tire. Defendant Bennett gives the heads up to [Goodwine] about a gun that needs to be hidden in the house and Defendant [Wynn] gives that gun to [Goodwine] to hide upstairs." The prosecutor added that "they obstructed justice, because Defendant Bennett was holding the door closed so that the police couldn't get in."

## II.  Obstruction of Justice

### A.  The Statute

Under D.C.Code § 22–722(a)(6), "[a] person commits the offense of obstruction of justice if that person: ... [c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding." This provision appears at the end of a series of subsections enumerating various means of committing obstruction of justice, several of which also refer to an "official proceeding." *See* D.C.Code § 22–722(a)(1)–(6) (2001).[6]

---

4.  Firearm and tool mark examination later revealed that the pistol had been used to fire thirteen of the forty-six shell casings found surrounding Damon Clark's body.

5.  Goodwine testified that shortly after the police left, she called Wynn's brother, who retrieved the gun.

6.  The full obstruction of justice statute reads: (a) A person commits the offense of obstruction of justice if that person:

The term "official proceeding" is defined in § 22–721(4) as "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding."

During appellant's trial, the jury was instructed without objection that "[t]he term official proceeding means any trial, hearing, investigation or other proceeding, that is[,] the investigation of the fatal shooting of Damon Clark conducted by the Metropolitan Police Department of the District of Columbia." Appellants claim, however, that their convictions for obstruction of justice "cannot stand because the MPD's investigation into Clark's shooting did not constitute an 'official proceeding' in which the 'due administration of justice'

was administered." This issue thus turns on whether "the due administration of justice in any official proceeding" can fairly be said to include the actions of police officers first responding to the scene of a violent crime. We answer "no."

### B. *Timberlake* and *Crutchfield*

The government contends that appellants' "claim is foreclosed" by our decisions in *Timberlake v. United States*, 758 A.2d 978 (D.C.2000), and *Crutchfield v. United States*, 779 A.2d 307 (D.C.2001). However, although these opinions addressed similar issues, we have not definitively answered "the difficult question[ ] of what constitutes an 'official proceeding.'" *Timberlake*, 758 A.2d at 983 n. 6. Moreover, neither *Timberlake* nor *Crutchfield* interpreted what constitutes obstruction of "the due administration of justice in any official proceed-

(1) Knowingly uses intimidation or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a juror in the discharge of the juror's official duties;
(2) Knowingly uses intimidating or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a witness or officer in any *official proceeding*, with intent to:
(A) Influence, delay, or prevent the truthful testimony of the person in an *official proceeding;*
(B) Cause or induce the person to withhold truthful testimony or a record, document, or other object from an *official proceeding;*
(C) Evade a legal process that summons the person to appear as a witness or produce a document in an *official proceeding;* or
(D) Cause or induce the person to be absent from a legal *official proceeding* to which the person has been summoned by legal process;
(3) Harasses another person with the intent to hinder, delay, prevent, or dissuade the person from:

(A) Attending or testifying truthfully in an *official proceeding;*
(B) Reporting to a law enforcement officer the commission of, or any information concerning, a criminal offense;
(C) Arresting or seeking the arrest of another person in connection with the commission of a criminal offense; or
(D) Causing a criminal prosecution or a parole or probation revocation proceeding to be sought or instituted, or assisting in a prosecution or other *official proceeding;*
(4) Injures any person or his or her property on account of the person or any other person giving to a criminal investigator in the course of any criminal investigation information related to a violation of any criminal statute in effect in the District of Columbia;
(5) Injures any person or his or her property on account of the person or any other person performing his official duty as a juror, witness, or officer in any court in the District of Columbia; or
(6) Corruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any *official proceeding.*
D.C.Code § 22–722(a)(1)–(6) (2001) (emphasis added).

ing" as prohibited by D.C.Code § 22–722(a)(6).

In *Timberlake*, the defendant was convicted under D.C.Code § 22–723(a) (1996)[7] of tampering with physical evidence. 758 A.2d at 979. Although the definition of "official proceeding" applies to both offenses, tampering with physical evidence is a distinct crime from obstruction of justice. Under § 22–723(a), a defendant must know or have "reason to believe an official proceeding has begun" or know "that an official proceeding is likely to be instituted." We specifically noted in *Timberlake* that "only the knowledge element of the offense [wa]s at issue." *Id.* at 981.

After "a marked police car drove through the intersection, and an unknown female yelled 'five-o,' indicating that police were in the area," Timberlake hid bags of drugs in his mouth. *Id.* at 980. Unexpectedly, an undercover police officer identified himself and tried to prevent Timberlake from swallowing the bags. *Id.* We concluded that, "[o]n the facts of this case, a reasonable jury could find that once Officer Neill [the undercover officer] had identified himself and the struggle ensued, Timberlake knew an official proceeding *was likely to be instituted* against him and thus possessed the requisite state of mind as he attempted to destroy (*i.e.*, swallow) the evidence." *Id.* at 983 (emphasis added). In this holding, the court seemed to be treating the criminal prosecution that followed, rather than the police investigation, as the "official proceeding." This understanding of the opinion in *Timberlake* is supported by the quotation from a Colorado case which followed immediately thereafter. *See* 758 A.2d at 983 (quoting

*Frayer v. People*, 684 P.2d 927, 929 (Colo. 1984) (en banc) ("A person arrested with such contraband in her possession . . . has every reason to believe that formal charges will be filed against her.")).

We thus did not rest our holding on the government's argument that, before the officer identified himself, Timberlake "knew, or had reason to believe, that an official proceeding (*i.e.*, a police investigation) had begun, or was likely to be instituted." *Timberlake*, 758 A.2d at 981. Noting that we were affirming "on an alternative theory," we did "not reach the difficult questions of what constitutes an 'official proceeding' and what is sufficient subjective knowledge that an official proceeding is 'likely to be instituted' absent circumstances that objectively manifest the proceeding, such as confrontation with police while in possession of contraband." *Id.* at 983 n. 6. We noted, moreover, that "[w]e have never addressed the degree of formality or specificity required for there to be an 'official proceeding.' " *Id.* We therefore do not interpret *Timberlake* as holding that an incipient police investigation is an "official proceeding."

The government also asserts that in *Crutchfield v. United States* our court "squarely held that a police investigation is an 'official proceeding' under D.C.Code § 22–722(a)(6)." But in *Crutchfield*, the defendant was convicted of obstructing justice under § 22–722(a)(2), a separate provision criminalizing interference with witnesses. 779 A.2d at 312–13 n. 1; *see supra* note 6. We did not interpret what constitutes "the due administration of justice in any official proceeding" within the meaning of § 22–722(a)(6).

---

**7.** A person commits the offense of tampering with physical evidence if, knowing or having reason to believe an official proceeding has begun or knowing that an official proceeding is likely to be instituted, that person alters, destroys, mutilates, conceals, or removes a record, document, or other object, with intent to impair its integrity or its availability for use in the official proceeding.
D.C.Code § 22–723(a) (1996).

Crutchfield had murdered three people, and he later killed Takiesha Wiseman, a friend who was a potential witness against him. His appeal required this court to focus upon § 22–721(4)'s definition of an "official proceeding," and portions of our opinion appear to refer to an ongoing police investigation of the triple murder as the official proceeding. *See Crutchfield,* 779 A.2d at 328. Quoting the definition of an "official proceeding," the court italicized the portion related to an "investigation" conducted by "an agency or department of the District of Columbia government." *Id.* at 328. It also quoted the definition of a "criminal investigation."[8] Nevertheless, *Crutchfield* also involved a formal grand jury investigation and a pending criminal prosecution, both of which are unquestionably covered by the definition of an "official proceeding." *Id.* at 315, 328; *see* D.C.Code § 22–721(4) (1996).

Part of the proof against Crutchfield included evidence that "less than two weeks before Wiseman's death, she and appellant were at the courthouse office of appellant's aunt inquiring as to the status of the case against Simpson pertaining to the triple murder." *Crutchfield,* 779 A.2d at 328. Having examined the record in *Crutchfield,* appellant Bennett further informs us that the indictment against Crutchfield charged that he "endeavored to influence, intimidate, and impede a witness, that is, Takiesha Wiseman, in a Grand Jury Investigation in the case of *United States v. Jamyra Simpson* ... and in *In re: Darryl D. Crutchfield,* an official proceeding in the Superior Court of the District of Columbia."[9] He also represents that neither Crutchfield nor the government addressed in their briefs whether

a police investigation qualified as an official proceeding. Thus, the court's conclusion that appellant was aware "of an ongoing investigation into the triple murder, which qualifies as an official proceeding under the obstruction statute," was most likely a reference to the ongoing *grand jury* investigation. *Crutchfield,* 779 A.2d at 328.

We conclude that neither *Timberlake* nor *Crutchfield* "squarely held" that a police investigation constitutes an "official proceeding" within the meaning of the obstruction of justice statute. More importantly, this court has not decided what constitutes "the due administration of justice in any official proceeding."

## C.  Statutory Construction

Appellants moved for judgment of acquittal on the obstruction of justice charges, but they failed to argue that MPD's incipient investigation into Clark's shooting was not an "official proceeding" involving the "due administration of justice." Nor did they object to the instruction which referred to the police investigation as an "official proceeding." Nevertheless, it is conceptually difficult to determine our standard of review.

Although appellants' claim is, at least in part, an attack upon the sufficiency of the evidence, *see Newby v. United States,* 797 A.2d 1233, 1237–39 (D.C.2002), there was no additional evidence the government could have produced to meet their challenge had appellants couched it in these terms in the trial court. Ultimately, appellants assert that the government's theory of prosecution was misconceived. *See id.* at 1239 (Appellant's "claims turn on pure questions of law: whether the simple

---

8. D.C.Code § 22–721(3) (1996) defined "criminal investigation" as "an investigation of a violation of any criminal statute in effect in the District of Columbia."

9. *See Renard v. District of Columbia Dep't of Emp't Servs.,* 673 A.2d 1274, 1276 (D.C.1996) ("a court may take judicial notice of its own records").

assault statute applies to parent-child assaults at all, and whether the government must prove malice to overcome the assertion of the parental discipline defense. Our review of these questions is de novo.").

At bottom, we are called upon to determine the reach of the statute which prohibits obstruction of justice. *Cf. Mitchell v. District of Columbia*, 741 A.2d 1049, 1052 (D.C.1999) ("Essentially, Mitchell argues that his conviction is based on conduct which the statute does not make a crime...."). "It would be both an obvious error and a miscarriage of justice for a defendant to stand convicted of an offense which the law does not make a crime." *Id.* at 1052–53; *see also Jeffrey v. United States*, 892 A.2d 1122, 1128 (D.C.2006) ("Because Jeffrey failed to raise this specific claim in the trial court, we would ordinarily review it for plain error.... Due to the importance of the statutory interpretation issue, however, we have decided to review the case *de novo*.").

■■■ We review issues of statutory construction *de novo*. *See District of Columbia v. Economides*, 968 A.2d 1032, 1035 (D.C.2009). "When interpreting a statute, the judicial task is to discern, and give effect to, the legislature's intent." *A.R. v. F.C.*, 33 A.3d 403, 405 (D.C.2011) (quoting *Grayson v. AT & T Corp.*, 15 A.3d 219, 237 (D.C.2011) (en banc)). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc). "We recognize, however, that a word in a statute may or may not extend to the outer limits of its definitional possibilities." *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C.2010) (en banc) (quoting *Dolan v. United States Postal Service*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006)) (internal editing and quotation

marks omitted). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). Therefore, "we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 652 (D.C.2005) (en banc).

Under D.C.Code § 22–722(a)(6), a person commits obstruction of justice if he "[c]orruptly, or by threats of force, [in] any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding." To reiterate, § 22–721(4) defines "official proceeding" to mean "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding."

## D. Official Proceeding

The government argues that because an "official proceeding" literally includes at least some types of "investigation[s] ... conducted by ... an agency ... of the District of Columbia government," D.C.Code § 22–721(4) (2001), and because the Metropolitan Police Department is one such agency, § 22–722(a)(6) should apply to any police investigation. But this reading omits the full language of the statute that gives these terms meaning, including the language of § 22–722(a)(6) itself. *See Moskal v. United States*, 498 U.S. 103, 109–10, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) ("a court should give effect, if possible, to every clause and word of a statute" (quotation marks omitted)).

On its face, the term "official proceeding" suggests a formal event. Whether the event is a "trial, hearing, [or] investigation," it still must be a "proceeding" of some sort. The word "proceeding" may comfortably be used to describe investigations by a grand jury, the Council of the District of Columbia, or various administrative agencies.[10] *See* BLACK'S LAW DICTIONARY 1324 (9th ed.2009) (defining "proceeding" as "[t]he regular and orderly progression of a lawsuit" or "[t]he business conducted by a court or other official body; a hearing"). It is unclear what a "proceeding," much less an "official proceeding," would mean in the context of a rapidly unfolding MPD response to the sound of gunshots.

The term "official proceeding" is used throughout § 22–722 in contexts that bear little resemblance to a preliminary street investigation by police. For example, the obstruction of justice statute punishes endeavors to "prevent the truthful testimony of [a] person in an official proceeding," to "[e]vade a legal process that summons the person to appear as a witness or produce a document in an official proceeding," or to "harass[ ]" a person for "assisting in a prosecution or other official proceeding." D.C.Code §§ 22–722(a)(2)(A), (C), (3)(D) (2001). The language of these prohibitions suggests a formal process where evidence is elicited through testimony or produced in response to subpoenas.

The legislative history of §§ 22–722(a)(6) and 22–721(4) supports this more formal concept of an "official proceeding." When the Council first defined the term in 1982,[11] it meant "any trial, hearing, or other proceeding in any Court of the District of Columbia or any agency or department of the District of Columbia government." D.C.Code § 22–721(4) (1989). The Council Report expressly stated that the "term [wa]s intended to include proceedings in which rights, issues, or other matters are adjudicated as well as investi-

**10.** For example, witnesses may be subpoenaed and required to testify in "grand jury proceedings," which are also referred to generally as "grand jury investigations." Moreover, the grand jury conducts deliberations and it votes on whether to return an indictment. *See, e.g.,* Super. Ct.Crim. R. 6 (entitled "The grand jury"); *Davis v. United States,* 641 A.2d 484, 488 (D.C.1994) (describing the nature of grand jury proceedings). The Council likewise holds formal hearings "to investigate any matter relating to the affairs of the District." D.C.Code § 1–204.13 (2001) (Investigations by the Council). Many agencies of the District of Columbia have court-like investigatory powers, such as the power to subpoena witnesses and to receive evidence under oath. *See, e.g.,* D.C.Code § 5–1111 (2001) (investigations by the Office of Police Complaints); 4 DCMR § 110 (2011 Supp.) (investigations by the Office of Human Rights). MPD itself conducts internal investigations of police misconduct through "hearing tribunals," which are empowered to record pleas, summon witnesses, hear testimony, require depositions, and issue written findings of fact and conclusions of law. Metropolitan Police Department, General Order 120.21, Disciplinary Procedures and Processes at 4, 15–16 (April 13, 2006), replacing Metropolitan Police Department, General Order 1202.1, Disciplinary Procedures and Processes at 29–30 (Nov. 10, 1983); *see* D.C.Code § 5–133.06 (2001) (authorizing Metropolitan Police Department trial boards).

**11.** Prior to 1982, the District of Columbia's obstruction of justice statute followed its federal counterpart in punishing a person who, "by threats or force, endeavors to influence, intimidate, or impede any juror, witness, or officer *in any court* in the District in the discharge of his duties, or, by threats or force, in any other way obstructs or impedes or endeavors to obstruct or impede the due administration of justice *therein.*" D.C.Code § 22–703(a) (1981) (emphasis added). The statute separately defined a "criminal investigation" and punished a person who "injures any person or his property" for providing information to investigators during a criminal investigation. D.C.Code § 22–703(a)–(b) (1981).

gatory proceedings such as grand jury proceedings." D.C. Council, Report on Bill 4–133 at 104 (Feb. 12, 1981).

In 1993, the Council expanded § 22–721 to explicitly "include with[in] the definition of 'official proceedings' grand jury and Council of the District of Columbia proceedings." D.C. Council, Report on Bill 9–385 at 3 (May 20, 1992).[12] It did so by adding the words "investigation," "conducted by the Council of the District of Columbia," and "a grand jury proceeding" to the definition of official proceeding. D.C.Code § 22–721(4) (1993 Supp.). The resulting definition is the same one we have today: "any trial, hearing, *investigation,* or other proceeding in a court of the District of Columbia *or conducted by the Council of the District of Columbia* or an agency or department of the District of Columbia government, *or a grand jury proceeding.*" D.C.Code § 22–721(4) (1993 Supp.); D.C.Code § 22–721(4) (2001) (emphasis added).

Thus, when the Council originally inserted the term "investigation," it did so with the clear intention of adding formal investigations by the grand jury and the Council itself. When the Council enacted the catchall "due administration of justice" provision, it gave no indication that it intended to transform the meaning of "official proceeding" and create a new felony for endeavoring to hide evidence from,[13] or elude capture by, police officers responding to the scene of a crime. Rather, the Council's consistent theme was its concern for the safety of government witnesses.[14]

The initial investigation of a crime by police fits comfortably within the separate definition of a "criminal investigation"— "an investigation of a violation of any criminal statute in effect in the District of Columbia." D.C.Code § 22–721(3) (2001). Notably, however, a person obstructs justice under the related subsection of § 22–722 only when he or she "injures or threatens to injure any person or his or her property on account of" a person giving information "to a criminal investigator in the course of any criminal investigation . . . ." D.C.Code § 22–722(a)(4) (2011 Supp.); *see McCullough v. United States,* 827 A.2d 48, 58 (D.C.2003) (witness murdered for reporting assault to the police). Because the statute already includes a police investigation within the definition of "criminal investigation," we need not stretch the meaning of "official proceeding" to reach the very same circumstances. *See Tuten v. United States,* 440 A.2d 1008, 1010 (D.C.1982) ("A statute should not be construed in such a way as to render certain provisions superfluous or insignifi-

**12.** The Council's preeminent concern was the protection of government witnesses. *See* D.C. Council, Report on Bill 9–385 at 3 (May 20, 1992) ("Inclusion of grand jury proceedings is particularly significant because threats and intimidation of witnesses often occur pre-indictment or during the grand jury phase of the criminal process."); *Woodall v. United States,* 684 A.2d 1258, 1263–64 (D.C.1996) ("The obstruction of justice statute was amended in response to the widespread corruption, intimidation, and murder of witnesses in the District, and to provide 'an additional weapon . . . to combat the obstruction of justice.' ") (quoting D.C. Council, Report on Bill 9–385 at 2 (May 20, 1992)).

**13.** The D.C.Code's subchapter on "Obstruction of Justice" provides a separate basis for criminalizing efforts to hide evidence from the police: tampering with physical evidence. D.C.Code § 22–723(a); *see Timberlake,* 758 A.2d at 981 (appellant attempted to hide contraband from police by swallowing it).

**14.** *See, e.g.,* D.C. Council, Report on Bill 10–628, Statement of Eric H. Holder, Jr., United States Attorney for the District of Columbia at 9 (Oct. 26, 1994) ("Efforts to intimidate and influence witnesses *and thereby* obstruct the due administration of justice have become far too common in our City . . . .") (emphasis added).

cant."), *aff'd*, 460 U.S. 660, 103 S.Ct. 1412, 75 L.Ed.2d 359 (1983).

■ Appellants were convicted under § 22–722(a)(6), which requires that the defendant have "endeavor[ed] to obstruct or impede *the due administration of justice* in any official proceeding." (Emphasis added.) While the term "official proceeding" standing alone conceivably could include an initial police investigation of street crime, "the due administration of justice in any official proceeding" manifestly does not.

### E. Due Administration of Justice

■ The phrase "due administration of justice" is used primarily, if not exclusively, to describe the proper functioning and integrity of a court or hearing. *See, e.g., Fields v. United States*, 793 A.2d 1260, 1266 (D.C.2002) (By "inhibiting Tyanna Weedon from testifying freely and truthfully, ... Fields was attempting to impede the due administration of justice."); *Greene v. Weatherington*, 301 F.2d 565, 567 (D.C.Cir.1962) ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it."); *Moss v. United States*, 23 App.D.C. 475, 483 (1904) (" 'The power to punish for contempts is inherent in all courts: its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice.' " (quoting *Ex parte Robinson*, 19 Wall. 505, 86 U.S. 505, 510, 22 L.Ed. 205 (1873))). And although we did not directly interpret the phrase, our prior cases involving convictions for ob-

structing "the due administration of justice" illustrate this more natural reading of the term. For instance, in *Castillo–Campos v. United States*, an appellant obstructed the due administration of justice on a scheduled court date by endeavoring to intimidate potential government witnesses during a discussion of "snitching" in a holding cell. 987 A.2d 476, 492 (D.C. 2010); *see also Ball v. United States*, 429 A.2d 1353, 1355 n. 2 (D.C.1981) (intimidating subpoenaed witnesses); *Caldwell v. United States*, 218 F.2d 370, 371 (D.C.Cir. 1954) (attempting to obtain information from sitting jurors).

When MPD officers chased Mr. Ross down a darkened alleyway and wrestled with Mr. Bennett to open the apartment door, they were investigating a recently committed crime. But it would be anomalous to describe these officers as engaged in "the due administration of justice in any official proceeding" as they rushed to the scene of a street shooting and responded to the emergency situation they found there.

■ For all of these reasons, we conclude that the Council did not intend for "the due administration of justice in any official proceeding" to include an initial police response to the scene of a crime. We therefore reverse appellants' convictions under D.C.Code § 22–722(a)(6) (2001).[15]

### III. Special Unanimity

■ Cotey Wynn was also found guilty of carrying a pistol without a license ("CPWL") after having previously been convicted of a felony. D.C.Code § 22–4504(a)(2) (2001). He argues on appeal

---

**15.** We do not consider appellants' additional arguments that the government failed to prove that they acted with specific intent to obstruct justice, that D.C.Code § 22–722(a)(6) does not extend to concealment of physical evidence, and that we should hold that § 22–722(a)(6) contains a "nexus" requirement. *See United States v. Aguilar*, 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (construing 18 U.S.C. § 1503).

that the trial court was required to give a special unanimity instruction, cautioning jurors that they must unanimously agree which, if any, firearm he carried. *See* Criminal Jury Instructions for the District of Columbia, No. 2.406, Special Unanimity (5th ed. rev.2011). Mr. Wynn concedes that he did not request a special unanimity instruction and that our review is for plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).[16]

The Constitution guarantees the right to a unanimous verdict. *Scarborough v. United States,* 522 A.2d 869, 873 (D.C.1987) (en banc). Thus, " '[w]here one charge encompasses two separate incidents, the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which incident or incidents they find the defendant guilty.' " *Youssef v. United States,* 27 A.3d 1202, 1208 n. 9 (D.C.2011) (quoting *Scarborough,* 522 A.2d at 871). "Incidents have been found to be *factually* separate when separate criminal acts have occurred at different times and were separated by intervening events; when they occurred at different places; when the defendant has reached a fork in the road and has decided to invade a different interest; or when the first act has come to an end and the next act is motivated by a fresh impulse." *Gray v. United States,* 544 A.2d 1255, 1257 (D.C.1988) (citations omitted).

The jury could have found Mr. Wynn guilty of CPWL based upon three factual scenarios—that Wynn (1) carried a pistol he used to shoot at Damon Clark, (2) carried the unrecovered handgun that Goodwine saw in her apartment, or (3) carried the .45 caliber pistol found in the Toyota Camry (a handgun which Wynn's

counsel admitted belonged to his client). Each of these scenarios involves possession of (potentially) different weapons, at different times, and in different locations. *See Youssef,* 27 A.3d at 1208 n. 9 (special unanimity instruction required where "each of appellant's individual unauthorized transfers of $250 or more encompassed a separate incident of theft").

One could not fairly characterize these discrete acts of possession as "a continuing course of conduct," given the factual disparity of the scenarios. Instead, the facts of this case are analogous to those in *Hack v. United States,* where we held that the defendant's possession of marijuana laced with PCP (which he discarded while fleeing police), and his possession of marijuana only moments later in the back of a police car, were two factually separate incidents requiring a special unanimity instruction. 445 A.2d 634, 641 (D.C.1982).

Nevertheless, because appellant failed to preserve his claim at trial, it is not enough to show that a special unanimity instruction was warranted. *See Youssef,* 27 A.3d at 1207. Appellant also bears the burden of showing that the error was "clear" or "obvious," *Olano,* 507 U.S. at 734, 113 S.Ct. 1770, that it affected his "substantial rights," *Lowery v. United States,* 3 A.3d 1169, 1173 (D.C.2010), and "that the lack of a unanimity instruction jeopardized the fairness and integrity of his trial." *Youssef,* 27 A.3d at 1208; *cf. Wheeler v. United States,* 930 A.2d 232, 248 (D.C.2007) (discretion to reverse on plain error review "should be exercised only in 'particularly egregious' situations" (quoting *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989))).

---

**16.** Appellant Ross also argues that the trial court committed plain error by failing to give a special unanimity instruction regarding ob-

struction of justice. Because we reverse his conviction for that offense on separate grounds, we do not reach this claim.

■ Citing *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion), and *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the government asserts that "intervening Supreme Court case law ha[s] cast into doubt the 'factually separate incidents' test." According to the government, Mr. Wynn thus cannot show that the error should have been "clear" or "obvious" at the time of his trial. *See Thomas v. United States*, 914 A.2d 1, 20 (D.C.2006). However, *Scarborough v. United States*, an en banc decision of this court, has never been overruled, and in *Williams v. United States*, we explained why the government's position is a misreading of *Schad* and *Richardson.*[17] 981 A.2d 1224, 1229–30 (D.C.2009). Both Supreme Court decisions reinforced the principle "that the jury is required to unanimously agree as to which instances of a crime the defendant committed." *United States v. Newell*, 658 F.3d 1, 23 (1st Cir.2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 1069, 181 L.Ed.2d 783 (2012). It was therefore clear or obvious error for the court not to deliver a special unanimity instruction regarding the CPWL charge against Wynn.

■ However, it is doubtful that Mr. Wynn's "substantial rights" were affected by the failure to give a special unanimity instruction. Although there was evidence regarding three instances of carrying a pistol, the most natural conclusion is that the jury convicted Mr. Wynn for carrying the .45 caliber handgun found in his girlfriend's Toyota Camry.[18] During his opening statement, defense counsel told the jury that the .45 caliber pistol was Mr. Wynn's. He argued in closing, however, that "this particular firearm was jammed" and "the instructions say in order to find Mr. Wynn guilty of carrying a pistol without a license ... the firearm has to be operable and you simply don't have that element."

But at trial an officer testified that although a bullet was stuck in the firearm's barrel, other officers merely "pushed it out"; thereafter, the weapon was successfully test-fired. The jury could have readily concluded that the gun jammed while Mr. Wynn was using it, or that the easily removed obstruction did not render the gun "inoperable." *See Rouse v. United States*, 391 A.2d 790, 791 (D.C.1978) (jury could conclude that disassembled pistol was operable because it could be "quickly and easily reassembled into an operable gun"). During rebuttal, the government responded to Wynn's arguments, focusing the jury's attention on evidence of the weapon's operability.[19]

17. In *Scarborough* we held that a unanimity instruction may also be required for *"legally separate incidents,"* such as when the appellant presented separate legal defenses to the charges. 522 A.2d at 873. We acknowledged in *Williams* that this aspect of *Scarborough's* holding may arguably be in conflict with the holding of *Schad.* 981 A.2d at 1230 n. 26. But, as in *Williams*, Mr. Wynn has not relied upon a theory of legally separate incidents, so the issue is not before us. *See id.*

18. The government argued at trial that Mr. Wynn's CPWL charge was for possessing a firearm used to shoot at Damon Clark. However, the jury apparently rejected this theory, as it acquitted all three defendants of murder and possession of a firearm during a crime of violence ("PFCV"), and it acquitted Mr. Ross and Mr. Bennett of CPWL. The jury arguably could have concluded that Mr. Wynn illegally possessed a gun in Ms. Goodwine's apartment, but neither party argued before the jury that this was a potential basis for the CPWL conviction.

19. Mr. Wynn also protests that there was insufficient evidence that he possessed an "operable" firearm because the .45 caliber pistol found in the Toyota Camry was initially jammed and the other firearms involved in the other two scenarios were never recovered.

In any event, on this record, appellant has not shown that the lack of a special unanimity instruction "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Lowery*, 3 A.3d at 1173 (quoting *In re D.B.*, 947 A.2d 443, 450 (D.C.2008)). The trial court issued a general unanimity instruction, and the most likely basis of conviction, that Mr. Wynn carried the pistol found in the Toyota Camry, was supported by ample evidence. "In other words, this is not one of those 'exceptional circumstances where a miscarriage of justice' will result if we do not reverse." *Davis v. United States*, 984 A.2d 1255, 1260 (D.C.2009) (quoting *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992)).

### IV. Conclusion

Appellants' convictions for obstruction of justice are hereby reversed. Appellant Wynn's conviction for CPWL is affirmed, and his case is remanded for possible resentencing. *See Stoney v. United States*, 494 A.2d 1303, 1304 (D.C.1985) ("We reverse the conviction for obstructing justice, affirm the other convictions, and remand for resentencing.") (citing *Thorne v. United States*, 471 A.2d 247 (D.C.1983) (per curiam)).

*It is so ordered.*

---

*See Price v. United States*, 813 A.2d 169, 172 (D.C.2002). For the reasons stated, there was sufficient evidence that the .45 caliber pistol was operable. We need not consider whether there was sufficient evidence to prove that the unrecovered weapons were also operable. *See Griffin v. United States*, 502 U.S. 46, 56–57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991);

*United States v. Nieves–Burgos*, 62 F.3d 431, 434, 436 (1st Cir.1995) (government produced evidence of three different firearms found in three separate locations to prove single count of use and possession of firearm; "the verdict must stand so long as it is sufficiently supported by the evidence concerning the third firearm") (citing *Griffin* ).