*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-305

DARNELL MASON, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 09/28/2017
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF3-17659-13)

(Hon. William M. Jackson, Trial Judge)

(Argued March 28, 2017                    Decided September 28, 2017)

*Matthew B. Kaplan* for appellant.

*Karen P. Seifert*, Trial Attorney, Criminal Division, United States Department of Justice, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

MCLEESE, *Associate Judge*:    Appellant Darnell Mason challenges his convictions for tampering with evidence, destruction of property, obstruction of justice, and unlawful entry. We hold that the trial court committed reversible error by disqualifying a potential juror. We therefore reverse the judgment and remand

for further proceedings. We also hold that the evidence was sufficient to support Mr. Mason's tampering convictions, so that Mr. Mason may be retried on those charges. We do not address Mr. Mason's other challenges to his convictions, because the circumstances giving rise to those challenges may well not arise on remand.

## I.

The evidence at trial indicated the following. At around 2:45 a.m. on October 3, 2013, Mikiyas Getachew was entering his home on Blaine Street NE when several men wearing black ski masks approached him. One of the men was armed with a pistol, and the men forced Mr. Getachew to open the door to his home. The man with the pistol kept it pointed at Mr. Getachew, his wife, Nava Wasihun, and his mother, Eleni Wodaje, while the other men searched for and removed valuable items including watches, cell phones, televisions, computers, an engagement ring, the keys to Ms. Wasihun's Nissan Altima, and the keys to Ms. Wodaje's Honda CRV.

About forty-five minutes after the robbery began, the men drove off in the Altima and the CRV, taking the other stolen property with them. After dividing

some of the stolen property among themselves, they took the rest to a house at 308 Raleigh Street SE. That house was unoccupied and for sale, and none of the men had permission to enter it.

Two of the men, Greg Gantt and Shareem Hall, drove the stolen cars to Brothers Place SE to avoid "leav[ing] any traces." While walking away from the vehicles, they ran into Ricardo Blakeney, who joined them. Ultimately, Mr. Gantt, Mr. Hall, Andre Townsend, and Mr. Mason decided to destroy any physical evidence left in the cars by setting the cars on fire. At a gas station, Mr. Hall filled a bottle with gasoline, and the men drove the cars toward a field at MLK Jr. Elementary School, arriving at about 5:05 a.m. They parked the cars next to each other, and Mr. Hall doused both cars with gasoline. Mr. Gantt and Mr. Townsend each set one of the cars on fire, and both cars were severely damaged as a result.

After stopping to sell two stolen cell phones, the group returned to 308 Raleigh. The group then used some drugs and fell asleep. The police tracked the group through a court-ordered GPS ankle monitor that Mr. Gantt was wearing. Officers went to 308 Raleigh and knocked on the front and back doors of the house. The group woke up, scattered the larger stolen items around the house, and brought the smaller stolen items into the attic, where they hid. After several hours,

all five men eventually left the house. Mr. Mason tried to flee by jumping over a fence to an alley behind the house, but he was tackled by an officer. After the men were arrested, the police recovered four black face masks and much of the stolen property from 308 Raleigh.

The police did not recover the gun. Mr. Hall last saw the gun in Mr. Townsend's possession as they left Blaine Street and Mr. Townsend got into the Nissan with Mr. Mason. Mr. Hall believed that the gun must have been left in the attic at 308 Raleigh. After his arrest, Mr. Mason made two phone calls from jail in which he apparently asked his friend to find and remove the gun from the attic.

## II.

Mr. Mason argues that the trial court committed reversible error by disqualifying a potential juror. We agree.

## A.

During jury selection, the trial court asked the potential jurors if they, their immediate family, or their close friends had been arrested for, charged with, or

convicted of a crime within the past ten years. Juror 7575-B was among the potential jurors who answered in the affirmative. During follow-up questioning, she explained that her half-brother had been jailed for assault in Texas, and her family suspected that racial profiling had been involved. She also said that her brother had been "treated unfairly" by the justice system as "a black man in Texas." When asked if her views about her brother would affect her ability to be impartial in this case, she responded:

> I mean I think I can be impartial. I mean I think it's shaped my view of the world. But I don't know the details of this case. I don't think I would see my brother in it. His situation is different. But I definitely, that's my experience with the system.

The prosecutor then asked Juror 7575-B if she thought that "black men in DC are treated fairly or unfairly by the criminal justice system," and she responded that she thought they were treated unfairly and that "things are tilted in the wrong direction."

The United States moved to strike Juror 7575-B for cause "based upon her statements that she believes . . . black men in DC are treated unfairly . . . by the criminal justice system." Defense counsel responded that Juror 7575-B "said she could be fair and impartial." The trial court granted the motion, stating, "[t]he problem for me is that she said that she thought people were being treated unfairly

here in DC, not just in Texas. So it has to be systemic . . . if she believes that black men are being treated unfairly."

**B.**

The trial court has "broad discretion over . . . decisions to strike a juror for cause." *Barrows v. United States*, 15 A.3d 673, 682 (D.C. 2011) (internal quotation marks omitted). That discretion is not unlimited, however, and "[t]he court is allowed to dismiss a juror on the ground of inferable bias only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Doret v. United States*, 765 A.2d 47, 53 (D.C. 2000) (brackets and internal quotation marks omitted), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

Under these principles, we hold that the exclusion for cause of Juror 7575-B was erroneous. The trial court disqualified Juror 7575-B because Juror 7575-B believed that the criminal-justice system reflects a systemic bias against black men. According to statistics cited by Mr. Mason, that belief is far from uncommon: research conducted in 2013 indicated that 35% of all adults and 68% of blacks

believed that blacks are treated less fairly than whites in the courts. Pew Research Center, *King's Dream Remains an Elusive Goal; Many Americans See Racial Disparities*, at 39-42 (Aug. 22, 2013), http://www.pewsocialtrends.org/files/2013/08/final_full_report_racial_disparities.pdf.

Mr. Mason argues that it is appropriate for this court to consider such statistical information in deciding this appeal. The United States responds by describing Mr. Mason's reliance on that statistical information as "wrong[]," but the United States does not provide any argument in support of that description. Nor does the United States otherwise dispute the propositions that concern about the racial fairness of the judicial system is not uncommon among the population as a whole and is more common among blacks. Under the circumstances, the United States has forfeited any objection to our consideration of this information. *See, e.g.*, *Kamit Inst. for Magnificent Achievers v. District of Columbia Pub. Charter Sch. Bd.*, 81 A.3d 1282, 1289 n.25 (D.C. 2013) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for

the argument, and put flesh on its bones.") (brackets and internal quotation marks omitted).

In any event, Mr. Mason's basic point finds ample support from other sources, including decisions from courts around the country. For example, there are dozens of decisions addressing the question whether it is unlawful discrimination in jury selection for a prosecutor to exercise a peremptory challenge against a black potential juror who expresses the belief that the criminal-justice system is unfair to blacks. *E.g.*, *United States v. Jones*, 600 F.3d 985, 990-92 (8th Cir. 2010). Those cases hold that it is permissible for a prosecutor to exercise a peremptory challenge on that basis, as long as that is the prosecutor's true reason for the challenge rather than a pretext for racial discrimination.[1] *E.g., id.* That issue is not before us, and we express no view about it. But the prevalence of cases involving potential jurors who express concern about the racial fairness of the criminal-justice system corroborates Mr. Mason's contention that such concern is both not uncommon in general and more common among blacks.

---

[1] Mr. Mason has not argued that in this case the prosecutor or the trial court engaged in impermissible racial discrimination in jury selection, and we see no basis for any such argument. Rather, we have no doubt that the prosecutor and the trial court were acting in a good-faith belief that Juror 7575-B was properly removable for cause based on her view of the criminal-justice system.

Moreover, concern about the racial fairness of the criminal-justice system has not been limited to individuals.  Rather, courts and other official bodies have repeatedly expressed such concern.  *See, e.g.*, *State v. E.J.J.*, 354 P.3d 815, 822 n.8 (Wash. 2015) (Madsen, C.J., concurring) ("According to a 2012 report by the Washington State Minority and Justice Commission . . . , African Americans and Whites are on two different ends of the spectrum, with the former exhibiting strong signs of cynicism about the ability of the justice system to provide fair, impartial, and respectful justice, and the latter displaying substantially more confidence and trust in the system.") (internal quotation marks omitted); *In re Charges of Unprofessional Conduct Contained in Panel File 98-26*, 597 N.W.2d 563, 567 (Minn. 1999) (per curiam) (Minnesota Supreme Court's Task Force on Racial Bias in the Judicial System's Final Report states that "the justice system still finds itself being used as a powerful tool of the pervasive prejudice and the subtle, often elaborately camouflaged discrimination that still deeply scars our national life"); *cf. McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) (Supreme Court has "engaged in unceasing efforts to eradicate racial prejudice from our criminal justice system") (internal quotation marks omitted); *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) ("The duty to confront racial animus in the justice system is not the legislature's alone.  Time and again, this Court has been called upon to enforce the

Constitution's guarantee against state-sponsored racial discrimination in the jury system.").

Standing alone, the belief that the criminal-justice system is systemically unfair to blacks is not a basis to disqualify a juror. Rather, that belief is neither uncommon nor irrational. Moreover, there is no basis for an inference that potential jurors holding that belief are necessarily unable to be impartial. To the contrary, potential jurors who hold that belief might well be particularly attentive to making sure that they perform their function impartially. The United States does not cite, and we have not found, any case upholding a trial court's removal of a potential juror for cause based solely on the potential juror's belief that the criminal-justice system was unfair to blacks.

More generally, courts have found error where a potential juror is disqualified for cause based solely on the potential juror's belief, without a determination that the belief would interfere with the potential juror's ability to be impartial. *See, e.g.*, *United States v. Padilla-Mendoza*, 157 F.3d 730, 733 (9th Cir. 1998) ("[T]he district court abused its discretion by making no effort to determine whether the two excluded jurors' beliefs regarding the marijuana laws would impair their performance as jurors. . . . [A] district court cannot dismiss jurors for

cause based solely on their acknowledgment that they disagree with the state of the law that governs the case. The court must make some effort to determine whether the jurors could, despite their beliefs, perform their duties as jurors. To presume that personal beliefs automatically render one unable to act as a juror is improper."); *King v. State*, 414 A.2d 909, 910-13 (Md. 1980) (trial court erroneously disqualified for cause potential jurors in drug case based on potential jurors' belief that drug laws should be changed; "It is common knowledge that a significant segment of our society believes, as a matter of public policy, that the criminal laws relating to marijuana should be modified in one way or another. Such a belief concerning a matter of debatable public policy raises no presumption that those persons could not properly apply the existing laws to the evidence. Moreover, if all such individuals were automatically excluded from juries hearing criminal cases like the instant one, a large part of the community would be excluded from jury service in many criminal prosecutions under the laws relating to controlled dangerous substances.").

It is possible that a potential juror who believes that the criminal-justice system is unfair to blacks might respond to that belief by having difficulty being impartial. Where a trial judge makes that finding based on an adequate record, the potential juror can appropriately be disqualified for cause. But that is not what

happened in the present case. First, the trial court treated Juror 7575-B's beliefs as in themselves disqualifying, without making any finding that Juror 7575-B herself would be unable to be impartial. Second, Juror 7575-B responded to follow-up questioning by indicating that she thought she could be impartial. The record thus provides no individualized basis for a conclusion that Juror 7575-B's beliefs made her unfit to serve as a juror.

The United States argues that Juror 7575-B was equivocal about whether she could be impartial, because she used the word "think." We are not persuaded. The United States did not argue in the trial court that Juror 7575-B's answer was equivocal and that the trial court should on that basis infer that she could not be impartial. Nor did the trial court rely on such an inference in stating its reason for disqualifying Juror 7575-B. In fact, both the United States and the trial court took precisely the opposite view, in the context of a different potential juror, Juror 3180, whose answers were similar to those of Juror 7575-B. Juror 3180's father had been murdered in a home-invasion robbery. When asked whether that would affect her impartiality, Juror 3180 said "I don't think so. [I]t's hard to say . . . . I would hope that it wouldn't. But I couldn't definitively tell you no, it won't affect my judgment or anything. Because, unfortunately, life experiences do affect your judgment at times." Defense counsel moved to strike the potential juror for cause,

but the United States argued that the juror "said I think what most people would say[,] which is I'm going to do my very best, I believe that I can do it." The trial court agreed and denied the motion to disqualify the juror for cause, explaining that its "experience in doing these voir dires is [that] certain people . . . qualify everything. . . . They'll say possibly, they'll say probably, I would think I could, I would think I would be fair, I hope I would be fair." The court further explained that Juror 3180 "seemed very reflective. And she said I don't know what the facts are in this case . . . [and] she said we are all a product of our life experiences. So I'm going to take her at her word." We cannot affirm the trial court's ruling on a factual ground that was not relied upon by the trial court and that would directly contradict a position argued by the United States and accepted by the trial court. *See, e.g.*, *Van Leeuwen v. Blodnikar*, 144 A.3d 565, 570 (D.C. 2016) ("[P]arties may not take one position at trial and a contradictory position on appeal.") (internal quotation marks omitted).

## C.

We turn to the question whether the erroneous removal of Juror 7575-B requires reversal. The United States rests entirely on the contention that Mr. Mason bore the burden of showing prejudice, specifically by showing that an

actually biased juror sat on the jury at trial. If Mr. Mason has such a burden, he did not carry it. We conclude, however, that Mr. Mason did not bear the burden of showing prejudice.

In some circumstances, we have required defendants seeking reversal based on an error in jury selection to show that they were prejudiced by the error. *See, e.g.*, *Tate v. United States*, 610 A.2d 237, 239 (D.C. 1992) (even if prospective juror was erroneously disqualified for cause based on scheduling issues, reversal was unwarranted unless defendant could show "that as a result an impanelled juror failed to conscientiously apply the law and find the facts") (internal quotation marks omitted). In other circumstances, we have required the government to demonstrate lack of prejudice in order to avoid reversal. *E.g.*, *Hinton v. United States*, 979 A.2d 663, 690-91 (D.C. 2009) (en banc).

Our cases do not make clear where the precise lines lie in this area. We said in *Hinton* that "[o]rdinarily, the erroneous excusal of a prospective juror for cause can have no adverse effect on the impartiality of the chosen jury or the defendant's rights, for it cannot cause the seating of a biased juror." 979 A.2d at 688 (internal quotation marks omitted). But we also noted in *Hinton* that "[t]here are exceptions to this generalization. For example, where venire members are targeted for

exclusion based on their views, it may unacceptably skew the jury in favor of one side." *Id.* at 688 n.112 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) ("[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.")); *see id.* at 690-91 (where trial court permitted jurors to suggest questions that court could ask witnesses, and juror was erroneously disqualified for cause mid-trial based on content of questions suggested by juror, error required reversal unless United States demonstrated that error was harmless).

The Supreme Court has a substantial body of case law involving claims that potential capital-sentencing jurors were erroneously disqualified on the basis of their views about the death penalty. *E.g.*, *Ross v. Oklahoma*, 487 U.S. 81, 85-91 (1988) (citing cases). In that setting, the Supreme Court has held that reversal of a death sentence is required if even a single potential juror is erroneously disqualified on the basis of views about the death penalty. *Davis v. Georgia*, 429 U.S. 122, 122-23 (1976) (per curiam). The Supreme Court has suggested, however, that this line of authority may not have direct application outside the context of the death penalty. *Lockhart v. McCree*, 476 U.S. 162, 182-83 (1986)

(noting that "both *Witherspoon* and *Adams*[ *v. Texas*, 448 U.S. 38 (1980),] dealt with the special context of capital sentencing, where the range of jury discretion necessarily gave rise to far greater concern over the possible effects of an imbalanced jury," and "reject[ing] [the] suggestion that *Witherspoon* and *Adams* have broad applicability outside the special context of capital sentencing") (internal quotation marks omitted). We assume that the Supreme Court's death-penalty cases are not directly applicable here, but we nevertheless find them instructive.

A number of courts have grappled more directly with the question whether, in a non-capital case, reversal is warranted when one or more potential jurors are erroneously disqualified for cause based on their beliefs or associations. Those courts have reached divergent conclusions. *See, e.g.*, *United States v. Brooks*, 175 F.3d 605, 606 (8th Cir. 1999) (even if trial court abused discretion in disqualifying potential jurors for cause in drug case on ground that potential jurors favored decriminalization of marijuana, reversal was not warranted because no actually biased juror was seated); *Padilla-Mendoza*, 157 F.3d at 734 (similar); *United States v. Salamone*, 800 F.2d 1216, 1227-29 (3d Cir. 1986) (reversing where trial court in firearms case erroneously disqualified for cause one potential juror and five potential alternate jurors solely on ground that they were associated with the

National Rifle Association; although court "might apply a different standard" in cases involving erroneous exclusion of single juror, case involved "wholesale exclusion of a particular group"); *King*, 414 A.2d at 913 (reversing where trial court erroneously excluded two potential jurors in drug case on basis of potential jurors' belief that drug laws should be changed; reversal was warranted because "trial court excluded the entire class of prospective jurors who believed that the marijuana laws should be modified, irrespective of any other consideration peculiar to those jurors").

Turning back to the present case, the erroneous disqualification of Juror 7575-B is of particular concern for several reasons: (1) the disqualification rested on Juror 7575-B's beliefs about the criminal-justice system and race, which are important matters of legitimate public debate; (2) Juror 7575-B's beliefs are neither uncommon nor irrational; (3) Juror 7575-B's beliefs also might have a beneficial effect on Juror 7575-B's performance of her duties as a juror; (4) Juror 7575-B's beliefs would naturally make her an appropriately desirable juror for a criminal defendant; and (5) because black potential jurors are more likely to doubt the racial fairness of the criminal-justice system, exclusion of potential jurors holding such beliefs would have a disparate impact on black potential jurors.

In the circumstances of the present case, we conclude that Mr. Mason was not required to demonstrate prejudice in order to obtain reversal. Even though it involved a single juror, Juror 7575-B's erroneous disqualification had a tendency to "unacceptably skew the jury in favor of one side." *Hinton*, 979 A.2d at 688 n.112. Moreover, because Juror 7575-B's beliefs are more commonly held by black potential jurors, her exclusion on the basis of those beliefs, though not reflective of intentional discrimination on the basis of race, could create reasonable concerns about the fairness of the judicial system. *Cf. United States v. Madeoy*, 286 U.S. App. D.C. 132, 137, 912 F.2d 1486, 1491 (1990) ("[T]he public suffers whenever the appearance of racial bias goes uncorrected in the courthouse.").

For the foregoing reasons, we hold that Mr. Mason was not required to demonstrate prejudice in order to obtain reversal. Mr. Mason argues that the erroneous removal for cause of Juror 7575-B was structural error requiring reversal. We need not decide that question. Even assuming arguendo that reversal would be unwarranted if the United States could carry its burden of establishing that the error was harmless, the United States has not attempted to carry that burden. We therefore conclude that Mr. Mason's convictions must be reversed and the case must be remanded for further proceedings.

**III.**

Mr. Mason also argues that the evidence was insufficient to support his tampering convictions, which rest on the burning of the cars, because (1) a police investigation is not an "official proceeding" within the meaning of the tampering statute; and (2) there was no evidence that Mr. Mason knew that an official proceeding was likely to be instituted against him. Although we have already held that Mr. Mason's convictions must be set aside, we nevertheless address his challenge to the sufficiency of the evidence on the tampering convictions, because a ruling in Mr. Mason's favor on that issue would bar retrial on the tampering charges. *E.g.*, *Evans v. United States*, 122 A.3d 876, 886 (D.C. 2015). We hold that the evidence was sufficient.

Mr. Mason's sufficiency challenge requires us to "determine the reach of the statute," and we decide that question de novo. *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012). We give effect to "the plain meaning of a statute when the language is unambiguous and does not produce an absurd result." *McNeely v. United States*, 874 A.2d 371, 387 (D.C. 2005) (internal quotation marks omitted).

The tampering statute, D.C. Code § 22-723 (a) (2017 Supp.), states in relevant part:

> A person commits the offense of tampering with physical evidence if, knowing or having reason to believe an official proceeding has begun or knowing that an official proceeding is likely to be instituted, that person alters, destroys, mutilates, conceals, or removes . . . [an] object, with intent to impair its integrity or its availability for use in the official proceeding.

"Official proceeding" is defined to mean "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or department of the District of Columbia government, or a grand jury proceeding." D.C. Code § 22-721 (4) (2012 Repl.). The Metropolitan Police Department (MPD) is an agency of the District government. *See, e.g.*, D.C. Code § 1-602.01 (c) (2017 Supp.) (providing that certain statutes "shall apply to employees of . . . all District agencies, including . . . the Metropolitan Police Department"); *Lattisaw v. District of Columbia*, 905 A.2d 790, 793 (D.C. 2006) (treating MPD as District agency for purposes of requirement that administrative claim must be presented to "appropriate District agency"). By its plain language, D.C. Code § 22-721 (4) therefore defines an "official proceeding" to include an MPD investigation.

Adhering to the plain language of the tampering statute does not "produce an absurd result." *McNeely*, 874 A.2d at 387 (internal quotation marks omitted). To the contrary, a legislature could rationally design a tampering statute to prohibit destroying evidence in order to hinder an ongoing or imminent police investigation. *See, e.g.*, Fla. Stat. Ann. § 918.13 (West 2017) ("No person, knowing that . . . an investigation by a . . . law enforcement agency . . . is pending or is about to be instituted, shall: . . . [a]lter [or] destroy . . . any . . . thing with the purpose to impair its verity or availability in such . . . investigation . . . ."); *Burdell v. Commonwealth*, 990 S.W.2d 628, 632 & n.2 (Ky. 1999) (listing states with tampering "statutes requiring only that the act of tampering occur under a belief that an official proceeding *or investigation* is pending or about to be instituted").

Mr. Mason argues, however, that giving effect to the plain language of the tampering statute is contrary to this court's decision in *Wynn*, 48 A.3d at 188-91. We disagree, because *Wynn* involved a different statute with different language. In *Wynn*, we were asked to decide whether interfering with an MPD investigation could qualify as "obstruct[ing] or imped[ing] *the due administration of justice* in any official proceeding," within the meaning of the obstruction-of-justice statute, D.C. Code § 22-722 (a)(6) (2001) (emphasis added). *Wynn*, 48 A.3d at 191. We answered that question in the negative. We noted that the term "official

proceeding" "on its face suggests a formal event." *Id.* at 189. But we acknowledged that the definition of "official proceeding" in § 22-721 (4) "literally includes" MPD investigations, and that "the term 'official proceeding' standing alone conceivably could include" an MPD investigation. *Id.* at 188, 191. Considering the pertinent statutory language as a whole, we held that the phrase "due administration of justice in any official proceeding" did not reach "an initial police response to the scene of a crime," because "[t]he phrase 'due administration of justice' is used primarily, if not exclusively, to describe the proper functioning and integrity of a court or hearing." *Id.* at 191. Moreover, in holding that the obstruction-of-justice statute did not reach "endeavoring to hide evidence from, or elude capture by, police officers responding to the scene of a crime," we explained that the tampering statute provided "a separate basis for criminalizing efforts to hide evidence from the police." *Id.* at 190 & n.13 (footnote omitted). Our decision in *Wynn* thus undermines rather than supports Mr. Mason's argument.

We therefore hold that an MPD investigation is an official proceeding within the meaning of the tampering statute. We now turn to the question whether the "evidence [wa]s sufficient, . . . after viewing it in the light most favorable to the [verdict], [for] *any* rational trier of fact [to] have found the essential elements of

the crime beyond a reasonable doubt." *Offutt v. United States*, 157 A.3d 191, 194 (D.C. 2017) (internal quotation marks omitted).

Mr. Mason and the other men badly damaged the cars about an hour and a half after they left the scene of the robbery. They did so because they wanted to destroy any fingerprints or other traces that they might have left in or on the cars. Given the serious nature of the home-invasion robbery, a reasonable juror could infer that Mr. Mason knew that a police investigation either had been instituted or was likely to be instituted. *Cf. Timberlake v. United States*, 758 A.2d 978, 983 n.6 (D.C. 2000) (noting that in cases involving "malum in se" crimes, it "may be reasonable to infer the likelihood of an investigation from the nature of the crime"); *Ruiz-Lopez v. Holder*, 682 F.3d 513, 519 (6th Cir. 2012) ("Although not a universal rule, offenses that can be classified as malum in se generally do involve moral turpitude, while those classified as malum prohibitum do not. Moreover, certain categories of crimes are easily classified as involving moral turpitude, . . . such as murder, rape, robbery, kidnapping, abuse, or some forms of aggravated assault.") (citation and internal quotation marks omitted).

Mr. Mason appears to argue that the United States was required to prove that he had reason to believe that the investigation had identified him or his

accomplices as targets. The language of the tampering statute is to the contrary, permitting conviction if the defendant "kn[ew] or ha[d] reason to believe an official proceeding ha[d] begun or kn[ew] that an official proceeding [was] likely to be instituted." D.C. Code § 22-723 (a). The statute does not require that the official proceeding already was, or eventually would be, directed in particular at the defendant or his accomplices. *Id.* Moreover, in the context of the obstruction-of-justice statute we have already indicated that the identity of the "prime suspect" of the official proceeding does not matter. *Crutchfield v. United States*, 779 A.2d 307, 328 (D.C. 2001) ("[T]he jury could have inferred beyond a reasonable doubt that appellant was aware that an investigation into the triple murder, an 'official proceeding' under the statute, was in progress, and that [the victim] had knowledge that would have been relevant to that investigation, *regardless of the identity of the prime suspect*.") (emphasis added).

## IV.

The judgment of the Superior Court is reversed and the case is remanded for further proceedings.

*So ordered.*