*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-CF-1209 & 20-CF-254

ROSE L. TAYLOR and ANWAR NAJIY, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF2-11263-19 & CF2-11262-19)

(Hon. Rainey E. Brandt, Trial Judge)

(Submitted September 22, 2021                    Decided January 27, 2022)

*Donald L. Dworsky* was on the brief for appellant Najiy.

*Michael L. Spekter* was on the brief for appellant Taylor.

*Michael R. Sherwin*, Acting United States Attorney, with whom *Elizabeth Trosman*, *Elizabeth H. Danello*, *Joseph Drummey*, *Sarah Martin*, and *Patricia A. Heffernan*, Assistant United States Attorneys were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON,* *Associate Judge*,

---

\* Judge Thompson was an Associate Judge of the court at the time of submission. Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.). She was qualified and appointed on October 4, 2021, to

(continued…)

and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: After a jury trial, Anwar Najiy appeals his convictions for unlawful possession of a firearm[1] and carrying a pistol without a license (CPWL).[2] He argues that: (1) the evidence was insufficient to show that he had the requisite mental state for each charged offense; (2) the court erred by failing to give a limiting instruction about admission of his prior uncharged criminal conduct in evidence; and (3) the government's rebuttal argument constituted prosecutorial misconduct. After the same trial, Rose Taylor appeals her convictions for attempted CPWL[3] and attempted tampering with evidence.[4] She claims the evidence was: (1) insufficient to show that she actually attempted to possess the pistol, and also (2) insufficient to prove that she had the requisite knowledge for tampering. In addition, she (3) joins appellant Najiy's prosecutorial misconduct claim. We affirm.

---

(…continued)
perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

[1] D.C. Code § 22-4503(a)(1) (2021 Supp.).

[2] D.C. Code § 22-4504(a) (2021 Supp.).

[3] D.C. Code § 22-4504(a) (2021 Supp.); D.C. Code § 22-1803 (2021 Supp.).

[4] D.C. Code § 22-723(a) (2021 Supp.); D.C. Code § 22-1803 (2021 Supp.).

## I. Background

### A. August 29, 2019 Incident

According to the government's evidence at trial, on August 29, 2019, Metropolitan Police Department (MPD) Officer Enea Ndrenika responded to a radio call about an unconscious person in Northeast D.C. He activated his body-worn camera (BWC) as he arrived on the scene to find an unconscious man lying on the ground near an open passenger-side car door with a woman attempting to do chest compressions on him. Later, at trial, Officer Ndrenika identified appellants Najiy and Taylor from the BWC footage and, from the audio, he identified Taylor saying at the scene that Najiy needed Narcan, a medication that reverses the effects of opioids such as heroin. After verifying that Najiy had taken heroin, Officer Ndrenika administered two doses of Narcan.

Najiy was still unconscious, but breathing, and Officer Ndrenika placed him on his side in the "recovery position" so that Najiy would not choke if he vomited. The BWC revealed that when Officer Ndrenika turned Najiy, appellant Taylor – who was standing next to the officer by Najiy's feet – got on top of Najiy. As Taylor was getting up, her left hand initially was on Najiy's back, and her other

hand was between her body and Najiy's stomach. She next appeared to be grabbing something with both hands. At this point, Officer Ndrenika – who had been focusing on the "[s]afety and . . . well-being of Mr. Najiy" – became aware of a "Tiffany blue" colored pistol when he saw it fall out of Taylor's hands onto the ground. Officer Ndrenika then placed Taylor under arrest. Najiy regained consciousness about five to ten minutes after being administered Narcan and was taken away in an ambulance.

When Officer Ndrenika reviewed the BWC footage, he saw that the butt of the pistol was visibly sticking out of Najiy's waistband as he first approached appellants. At trial, Officer Ndrenika testified that he had never encountered a gun of this color before. The gun belonged to Taylor and was registered in Virginia, where she is from.

### B. Appellant Taylor's Testimony

At the heart of Najiy's firearm offenses, in addition to Officer Ndrenika's evidence, was Taylor's testimony about the gun that fell out of her hands (later identified as the weapon Officer Ndrenika had seen in Najiy's waistband). Taylor testified on direct examination in the defense case that she was not testifying

because someone had forced her to do so or because she was afraid of anyone, adding that Najiy was her son's father.[5]  Taylor then testified that she had met up with Najiy that August day and "closed him in the car" because, although still conscious, he was "wobbling."  He then had started to "zone out" in the car and was not responding, she said.  Taylor further testified that she had put the gun into Najiy's waistband because she was upset with him and wanted to take a picture of him with it.  He was not alert at the time, and when she was trying to take the picture "his body slumped between the middle of . . . the seat and the [console]."  She went around to the side of the car and called 911.

Taylor also testified on direct that, on the phone with Najiy while he was incarcerated pending trial, she had told him that she had given the gun to him and that she was sorry.  Taylor added that she was trying to explain and apologize to

---

[5]  On cross-examination, the government elicited additional information about Taylor's and Najiy's relationship. Specifically, they had been in a relationship for about five years, though it had not been continuous.  They had been married but were divorced at the time of the incident.  Continuing on cross-examination, Taylor acknowledged that Najiy had helped provide for their son, and that it was important to her that Najiy was involved in his life.  She was upset with Najiy at the time of the incident here because she thought he was cheating.  However, she hoped their relationship would continue after the case was over, and she testified that when they talked on the phone while Najiy was incarcerated pending trial, they often said that they loved and missed each other.  Taylor hoped that after Najiy was released, they would get married and, although he had told her they would, he had also said this in the past.

him because he was probably confused. On cross-examination, Taylor further testified that, about a month and a half before the trial, she had told Najiy that she was not a snitch. Taylor revealed that during this same call, she again told Najiy that she had put the gun on him and Najiy then responded by telling Taylor that she was going to have to testify in this case.

On further cross-examination, the government elicited that Taylor had given several different accounts before trial of what happened with the gun on August 29. After she was arrested, Taylor told a police officer on the scene that she was trying to grab a phone, that she did not know the gun had been on Najiy, and that she would not have flagged down the police if she had known he had the gun. When she offered this explanation, Taylor added that Najiy was still unconscious. Later, however, Taylor told a detective a different story: that she had found the gun in her glove compartment when she was trying to get a tissue and put it on the seat, where Najiy sat on it. She further testified that she had told the detective that when Najiy overdosed, she had to pull him out of the car, and that when she did so the gun fell out of the car. Soon thereafter, however, she acknowledged that she had told the same detective what essentially had been her first story at trial: that she had planted the gun on Najiy because she was upset at him for cheating,

although she was not trying to get him arrested. She added that she was not in her "right mind" when she spoke with this detective.

On redirect-examination, Taylor explained that when she had told the police she did not know that Najiy had the gun on him, she meant that she "didn't remember to, like, put it back in the glove compartment." Because "so much stuff [was] happening," Taylor explained, she did not realize that he had the gun again until she saw it when "[h]e was . . . unconscious."

## C.    Prior Crimes Evidence

Before trial, the government provided a "Notice of Intent to Introduce Evidence of Other Crimes": that Taylor had reported to probation officers and the police that Najiy had stolen her pistol on three occasions in July 2019. The government also sought to admit an Instagram photograph of Najiy with a Tiffany blue pistol sticking out of his pocket.[6] The trial court ruled that the prior crimes

---

[6] The parties stipulated that on the date of the incident, Najiy knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year. They also stipulated that the MPD had no record that either Najiy or Taylor had a valid license to carry a pistol within the District of Columbia. Upon admission of Najiy's firearm conviction, the trial court immediately gave the jury a cautionary instruction that Najiy's prior felony conviction could only be used to

(continued…)

evidence was admissible under *Drew v. United States*[7] to show "knowledge" of Najiy's possession of the pistol. The court added that it would consider admissibility of this evidence under (*William*) *Johnson v. United States*[8] but asked both parties, in the meantime, to propose limiting instructions under *Drew*. Before the next appearance, the government advised that it would introduce evidence of Najiy's prior theft of the firearm only in its rebuttal case if Taylor testified.

During the defense case, counsel for Najiy preemptively asked Taylor about prior incidents the government had raised in its "*Drew* [and *Johnson*] notice." She testified on direct that she had called Najiy's parole officer on a number of occasions to report that he had stolen her gun, and that the officer had told her to call the police. She qualified that testimony, however, by adding that Najiy had not actually stolen her gun, but that she had reported him because she was upset.

---

(…continued)
satisfy the element of the charge for unlawful possession of a firearm and for no other purpose.

[7] 331 F.2d 85, 89-90 (D.C. Cir. 1964) (evidence admissible under *Drew* when offered for a "substantial, legitimate purpose," including, but not limited to, one of the following issues: (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; or (5) identity").

[8] 683 A.2d 1087, 1098 (D.C. 1996) (evidence admissible under *Johnson* when it "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context").

Taylor also called the police at one point to report that Najiy had held a knife to her neck during an altercation.

On cross-examination, Taylor acknowledged that, in the past, Najiy had yelled at her, threatened her, and struck her, and that she had obtained a restraining order against him "to get his attention." She added, however, that Najiy had never put a gun to her face or neck and that she was not afraid of him. Taylor's further cross-examination revealed that either Taylor or a neighbor had called the police when she and Najiy were arguing on July 6, 2019. Taylor told the police that during the argument, Najiy had choked her, and that he had taken her gun, which she described as a 9-millimeter Tiffany blue gun. Earlier, she had contacted a parole officer on March 7 and 14, 2019, and again on July 8, to report that Najiy had taken her gun. Also, on July 25, 2019, she reported to a parole officer that Najiy had given her gun back but then had stolen it again. She told police officers on July 29, 2019, that Najiy had stolen her gun from Virginia, where she kept it, and she showed them photos from Instagram depicting Najiy with a teal blue object protruding from his pocket that she said was her gun. On redirect-examination, however, Taylor testified that her statement to police that Najiy had stolen the gun from her in Virginia was not true, and that he had not been in Virginia.

In closing argument, the prosecutor brought up the prior incidents when Najiy reportedly had Taylor's gun as evidence that he knowingly and voluntarily had the gun when he overdosed:

> He had been suffering from a drug overdose, so the issue you have to decide is . . . how that gun came to be on him. And you've heard testimony from Miss Taylor that she reported the gun stolen a month earlier by Mr. Najiy, that he had stolen it from her, and she also presented a picture of Mr. Najiy with a Tiffany blue butt of a gun sticking out of a pocket. And so it's up for you to decide if you think that Mr. Najiy possessed that firearm voluntarily before he overdosed and that that's how it got on his body that day.

Later in rebuttal, the prosecutor argued that Taylor's bias and other motives were behind her inconsistent statements:

> She's invested herself in a five-year relationship with Mr. Najiy. And he's promised her that they're going to get married after this case is over. But it's not just that she's trapped, she's also terrified. This man has whispered in her ear that he's going to kill her when she got police involved in an argument. This man has put a knife to her throat. And ladies and gentlemen, this man took the gun, put it to her head and said he was going to kill her. So, ladies and gentlemen, when she took the stand and while she's sitting there right now, he is feet away from her. And she admitted to you on the stand that he's watching her, listening and hanging on every word that comes out of her mouth. So perhaps she doesn't have the luxury of telling you what really happened.

The jury found Najiy guilty of unlawful possession of a firearm and of CPWL. It found Taylor not guilty of the charged crimes of CPWL and tampering with physical evidence, but found her guilty of attempting to commit both offenses.

## II.    Issues

On appeal, Najiy contends the evidence was insufficient for the jury to have found that he had knowingly:  (1) possessed a firearm, and (2) carried it on his person.  Najiy also argues that the trial court abused its discretion by failing to provide the jury with a limiting instruction regarding his uncharged, allegedly criminal conduct related to the gun on previous occasions.

In her appeal, Taylor contends the evidence was insufficient to show that she actually attempted to carry the gun.  She also maintains that the officer's response to the scene did not constitute an "official proceeding," and thus that the evidence was insufficient to establish her "knowledge" necessary to establish "tampering."

Finally, both appellants argue that the prosecutor's rebuttal argument amounted to prosecutorial misconduct that prejudiced their substantial rights.

### III.    Sufficiency of the Evidence

When reviewing the sufficiency of the evidence, "we view the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence."[9] Moreover, the evidence "is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt."[10]

### A.    Knowing Possession of a Firearm (Najiy)

Appellant Najiy contends that, because he was unconscious when the officer arrived, the evidence was insufficient to prove that he had the requisite mens rea for his convictions, specifically that he not only had "possessed"[11] but also

---

[9]    *Brooks v. United States*, 130 A.3d 952, 955 (D.C. 2016) (internal quotations and brackets omitted).

[10]    *Hernandez v. United States*, 129 A.3d 914, 918 (D.C. 2016).

[11]    Although the trial court instructed the jury on both actual and constructive possession, Najiy does not specifically dispute, nor could he, that the evidence was sufficient to show that he had physical possession of the gun "by holding it in
(continued…)

"carried" the firearm, both voluntarily and on purpose – as the court had instructed the jury it must find for conviction of each charge.[12] We have recognized that "possession requires that the possessor *knowingly* be in control of the weapon."[13]

---

(…continued)

his . . . hand or by carrying it in or on his . . . body or person" as the court instructed was required for actual possession. Officer Ndrenika's body camera footage showed the gun sticking out of Najiy's waistband before Taylor jumped on top of him. Thus, we need not consider whether the evidence was sufficient to establish Najiy had intent to exercise dominion and control over the firearm, which is only required for constructive possession. *See Robinson v. United States*, 100 A.3d 95, 105 n.16 (D.C. 2014) ("Our cases have defined "actual possession" as the ability of a person to *knowingly* exercise direct physical custody or control over the property in question . . . . Constructive possession likewise entails knowledge of the location of the item, as well as the ability and intention to exercise dominion and control over it." (alteration in original) (internal quotation marks and citations omitted)); *see also White v. United States*, 714 A.2d 115, 118 & n.5 (D.C. 1998) (where case went to the jury on both actual and constructive theories of "carrying," "conviction [from general verdict] may be affirmed if the evidence was sufficient to support either theory").

[12] *See* Criminal Jury Instructions for the District of Columbia, No. 6.500 (rev. ed. 2021) ("The elements of the offense of carrying a pistol without a license . . . [include that the defendant carried a pistol] voluntarily and on purpose, and not by mistake or accident."); and *id.*, No. 6.511 ("The elements of the offense of unlawful possession of a firearm by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year . . . [include that the defendant possessed a firearm] voluntarily and on purpose and not by mistake or accident"). In an attempt to "simplify the elements relating to states of mind and make them more consistent," the standard jury instructions use this language to describe the required state of mind for general intent crimes. *Id.*, No. 3.100.

[13] *Robinson*, 100 A.3d at 105 (emphasis in original).

Viewing the evidence in the light most favorable to the government, we must consider whether the surrounding circumstances were sufficient to support an inference that Najiy possessed and carried the firearm voluntarily and knowingly before he lost consciousness.[14]  Although Taylor testified that she had planted the gun on Najiy as he was losing consciousness, she was impeached with two distinct prior inconsistent statements she made to police officers investigating the incident: first, that she did not know Najiy had the gun on him, and second, that she put the gun on Najiy's seat and it fell out when she pulled him out of the car.  Based on these inconsistencies, and other impeachment evidence tending to show her bias in his favor, a reasonable jury could have discredited her testimony that she planted the gun on Najiy.  Furthermore, Taylor testified that one month before the August 2019 incident, on July 29, 2019, she reported to police that Najiy had stolen her gun, and the government introduced a photograph she showed police at that time depicting Najiy with what appeared to be the same gun based on its distinctive color.  Although Taylor testified on redirect that she had lied to the police about Najiy's stealing the gun from her, the jury earlier heard testimony from Taylor to the contrary and was able to make credibility determinations based on reasonable inferences about the firearm, including that Najiy still had the gun on August 29

---

[14]  *See Bailey v. United States*, 831 A.2d 973, 986 (D.C. 2003) ("Intent is often inferred from surrounding circumstances.").

and put it in his waistband before he overdosed. Considering all of these circumstances, we conclude that the evidence was sufficient to support a finding that Najiy had placed the gun in his waistband himself before losing consciousness and therefore had the gun in his waistband voluntarily and knowingly for both offenses, "possession" and "carrying."

## B.  Attempt to Carry the Pistol (Taylor)

Appellant Taylor argues that the evidence was insufficient to show she had carried or attempted to carry a pistol without a license because "the evidence shows that the gun was never in [her] control even for an instant, even if she may have, according to the BWC, inadvertently touched it." A CPWL offense requires proof of "(1) carrying a pistol, either openly or concealed on one's person, outside one's own dwelling or place of business, or other land possessed by the defendant and (2) without a license to do so."[15] And "carrying" can be established through "actual possession of the pistol . . . on [her] person" or "constructive possession . . . about [her] person."[16]

---

[15] *McCullough v. United States*, 827 A.2d 48, 58 (D.C. 2003).

[16]  *White*, 714 A.2d at 118-19 (internal quotation marks omitted). Only under this constructive possession theory must the government separately "show

(continued…)

"In order to prove an attempt to commit any offense, 'the government must prove that the accused: (1) intended to commit that particular crime; (2) did some act towards its commission; and (3) . . . failed to consummate its commission.'"[17] "The act must go beyond mere preparation and must carry the criminal venture forward to within dangerous proximity of the criminal end sought to be attained."[18]

Viewing the evidence in the light most favorable to the government, a reasonable jury could have found Taylor "did some act" toward the commission of CPWL. In still photos in evidence from the BWC footage taken before Najiy was moved onto his side, the gun can be seen barely protruding from his waistband. It was secure enough not to fall to the ground when Officer Ndrenika first turned him on his side. In the BWC footage, as the officer is telling Taylor to get off of Najiy, her hands appear to be reaching down toward his waist and then dropping the gun from above his body. The footage accordingly supports a reasonable finding that

---

(…continued)
that the pistol was in such proximity to the person as to be convenient of access and within reach" for purposes of a CPWL conviction. *Id.* at 119 (internal quotations and citation omitted).

[17] *Corbin v. United States*, 120 A.3d 588, 602 n.20 (D.C. 2015) (quoting *Frye v. United States*, 926 A.2d 1085, 1095 (D.C. 2005)).

[18] *Id.* (quoting *Jones v. United States*, 386 A.2d 308, 312 (D.C. 1978)).

Taylor made an overt act toward gaining actual possession of the firearm, even if she did not succeed in obtaining possession.[19]

### C.    Knowledge of Official Proceeding (Taylor)

Taylor also challenges the sufficiency of the evidence that she had the requisite mens rea under the tampering statute, which provides:

> A person commits the offense of tampering with physical evidence if, knowing or having reason to believe an official proceeding has begun *or knowing that an official proceeding is likely to be instituted*, that person alters, destroys, mutilates, conceals, or removes . . . [an] object, with intent to impair its integrity or its availability for use in the official proceeding.[20]

Specifically, Taylor – without directly addressing mental state – contends that the "non-adversarial, non-investigatory" police stop did not constitute an "official proceeding."

---

[19]  To the extent that Taylor's argument about "inadvertently" touching the gun can be construed as challenging the intent element of attempted CPWL, the evidence was also sufficient to find that she was intentionally reaching for the gun.

[20]  D.C. Code § 22-723(a) (2021 Supp.) (emphasis added).

To the contrary, an "official proceeding" is defined under the tampering statute as "any trial, hearing, *investigation*, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or *an agency or department* of the District of Columbia government, or a grand jury proceeding."[21]   Accordingly, in *Mason v. United States*,[22] we held (as in this case) that "an MPD investigation is an official proceeding within the meaning of the tampering statute."[23]   We did not limit this interpretation to particular facts or circumstances; it was unqualified.[24]

Nonetheless, to define "official proceeding" under the tampering statute, Taylor draws upon our earlier ruling in *Wynn v. United States*:[25]   that an "official proceeding" under the obstruction of justice statute does not encompass (as in this

---

[21]   D.C. Code § 22-721(4) (2012 Repl.) (emphases added).

[22]   170 A.3d 182 (D.C. 2017).

[23]   *Id.* at 191.

[24]   *See id.* ("The language of the tampering statute . . . permit[s] conviction if the defendant 'kn[ew] or ha[d] reason to believe an official proceeding ha[d] begun or kn[ew] that an official proceeding [was] likely to be instituted.'   D.C. Code § 22-723(a).  The statute does not require that the official proceeding already was, or eventually would be, directed in particular at the defendant or his accomplices.").

[25]   48 A.3d 181 (D.C. 2012).

case) an "endeavor[] to hide evidence from, or elude capture by, police officers responding to the scene of a crime . . . ."[26] In *Mason*, however, addressing *Wynn*, we expressly distinguished an "official proceeding" under the obstruction statute from an "official proceeding" under the tampering statute.[27] We observed that the applicable phrase in the obstruction statute construed in *Wynn* – "obstruct[ing] or imped[ing] *the due administration of justice* in any official proceeding" – made clear that an obstruction proceeding was confined to covering "the proper functioning and integrity of a court or hearing."[28] Recognizing that limitation, we explained in *Mason* (quoting *Wynn*) that "the tampering statute provided 'a separate basis for criminalizing efforts to hide evidence from the police,'" and held that "an MPD investigation is an official proceeding within the meaning of the tampering statute."[29]

In this case, the evidence is sufficient to support a finding that, at the time Taylor sought to tamper with (conceal) the gun, she knew Najiy would likely be

---

[26] *Mason*, 170 A.3d at 191(quoting *Wynn*, 48 A.3d at 190).

[27] *Id.*

[28] *Id.* (emphasis and alterations in original) (quoting *Wynn*, 48 A.3d at 191).

[29] *Id.* (quoting *Wynn*, 48 A.3d at 190 & n.13).

arrested or otherwise investigated.[30] The gun-concealing act in question occurred during an interaction with a police officer who was physically present, and the gun was in his view.[31] A reasonable jury could have found that Taylor attempted to move the gun precisely because she knew that Officer Ndrenika was likely to see it and initiate an investigation. Given evidence sufficient for a finding that Taylor actually did attempt to gain possession of the gun, we perceive no reasonable basis for Taylor's attempt to do so other than to prevent Officer Ndrenika from detecting the firearm. Furthermore, Taylor's own testimony revealed her awareness of a likely police investigation, constituting an official proceeding. Aware that Taylor had told a detective she would not have "flagged down" a police officer if she had known that Najiy had a gun, a reasonable jury could have interpreted this to mean she knew that an officer's seeing the gun in Najiy's waistband would likely trigger an "official" investigative proceeding.

---

[30] Taylor acknowledges that the "official proceeding" need not be targeted against the person charged with tampering. *See id.* at 984.

[31] The fact that Officer Ndrenika was responding to a reported overdose and had performed life-saving measures does not meaningfully distinguish this situation. Because the tampering statute covers conduct where a person knows that an investigation is likely to be instituted, not just where an investigation has already begun, *see* D.C. Code §§ 22-723(a) & 22-721(4), it was not necessary that the officer was already investigating a crime when he arrived at the scene. Moreover, the fact that Officer Ndrenika performed emergency assistance does not render the stop wholly non-investigatory, where he might also have reason to investigate the drug activity or other cause of Najiy's unconsciousness.

In the alternative, Taylor points to language in *Timberlake v. United States*[32] in which we said the knowledge element of the tampering statute presupposes that the accused, in concealing evidence, subjectively "knew a proceeding was likely to be instituted" (if not yet begun); that the purpose of concealing the evidence was to make it "unavailable to the proceeding"; and that – of significance to Taylor – in cases involving "*malum in se*" crimes, it "may be reasonable to infer the likelihood of an investigation from the nature of the crime" itself.[33]  Taylor, however, does not argue, nor could she, that the required "likelihood" inference is limited to alleged "*malum in se*" crimes, such as homicide or robbery.  She says only that, according to *Timberlake*, "a non *malum in se* crime such as possession [of a firearm], does not automatically predict or foretell a police investigation," an accurate observation that is inconclusive here.  Furthermore, *Timberlake* itself suggested that a suspect's "confrontation with police while in possession of

---

[32]  758 A.2d 978, 980 (D.C. 2000) (affirming conviction based on unlawful tampering for concealment of drugs in his mouth, as well as "additional and sufficient evidence from which the jury could find that [he] knew he was the subject of a police investigation while he held the drugs in his mouth").

[33]  *Id.* at 983 n.6.  In this footnote we added: "[b]ecause we affirm on an alternative theory, we need not reach the difficult questions of what constitutes an 'official proceeding' and what is sufficient subjective knowledge that an official proceeding is 'likely to be instituted' absent circumstances that objectively manifest the proceeding, such as confrontation with police while in possession of contraband." *Id.*  Accordingly, we acknowledged that "[w]e have never addressed the degree of formality or specificity required for there to be an 'official proceeding.'" *Id.*

contraband" on occasion can objectively indicate a potential proceeding sufficient to reflect a suspect's subjective knowledge that an official proceeding is "likely to be instituted."[34]

### IV. Failure to Give Limiting Instruction About Prior Uncharged Criminal Conduct

Appellant Najiy contends that the trial court abused its discretion by failing to cure the prejudice from the evidence of uncharged criminal conduct attributable to his prior possession of the firearm. Where, as here, Najiy did not request a limiting instruction at trial, we review for plain error.[35] To establish plain error, "an appellant must show: (1) error, (2) that is plain, and (3) that has affected his substantial rights," meaning there is "a reasonable probability that, but for the error

---

[34] *See id.*

[35] *See Busey v. United States*, 747 A.2d 1153, 1166-67 (D.C. 2000). Najiy points to the trial court's comments, at the preliminary hearing when it ruled that the evidence could come in under *Drew*, that "a limiting instruction is going to be necessary . . . ." Najiy argues that the trial court had thus "recognize[ed] its duty to apply its discretion to avoid undue prejudice" but then failed to act on that recognition at trial, amounting to an abuse of discretion. This ruling, however, occurred before the government advised that it had decided not to introduce the evidence in its case in chief, and Najiy nevertheless chose to preemptively introduce evidence in the defense case, without requesting any limiting instructions.

claimed, the result of the proceeding would have been different."[36] "Even if all three of these conditions are met, this court will not reverse unless (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[37]

In general, "evidence of a crime for which the accused is not on trial is 'inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged.'"[38] Najiy concedes, however, that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible."[39] Even more strongly, we opined in (*William*) *Johnson* that such evidence can be "direct and substantial proof of the charged crime," and thus is not

---

[36] *Fortune v. United States*, 59 A.3d 949, 954 (D.C. 2013) (internal quotations and brackets omitted).

[37] *Id.* (internal quotations omitted).

[38] *Busey*, 747 A.2d at 1164 (emphasis in original) (quoting *Drew*, 331 F.2d at 89).

[39] *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977) (holding trial court did not abuse its discretion in admitting photographic evidence of defendant with a .45 caliber pistol, the type of gun used in the alleged murders, taken five months before the murders).

limited to the criteria for admission specified in *Drew*.[40]   When evidence is admissible under (*William*) *Johnson*, "we have held that the trial court is not required to give a limiting instruction *sua sponte*."[41]

As discussed previously, Najiy's state of unconsciousness when Officer Ndrenika arrived at the scene, combined with the fact that the firearm belonged to Taylor and her testimony that she had planted it on him, poses a complicated factual issue of how the firearm got in his waistband. Accordingly, the evidence of Najiy's prior possession of the very gun at issue on multiple occasions leading up to the August 2019 incident, including most recently on July 29, 2019, made it more likely that Najiy possessed the firearm on August 29, 2019, before he lost consciousness.   Indeed, the distinctive color of the gun further enhanced its probative value in supporting Najiy's subsequent possession.   As previously discussed, the jury was free to discredit Taylor's testimony that she had lied about

---

[40]  (*William*) *Johnson*, 683 A.2d at 1097-98; *see supra* note 7.

[41]  *Busey v. United States*, 747 A.2d at 1167 (collecting cases and holding that trial court did not commit plain error, or any error, where evidence of prior assault had been admitted as proof that defendant possessed means to commit the murder and "[o]ur review of the prosecutor's examinations . . . and . . . closing arguments satisfie[d] us that the jury was not asked improperly to infer criminal propensity from the evidence").

Najiy stealing the gun, and there was no testimony or other evidence of Najiy returning the gun to Taylor after she told police that he had taken it on July 29.

Najiy contends, nonetheless, that the alleged error was particularly harmful because "the uncharged conduct evidence went directly to the central and sole issue in the case":  whether he knowingly possessed the firearm.  Indeed, the probative value of the evidence that Najiy had previously possessed the blue-tinted gun is different from the probative value of the evidence in *Busey*,[42] *Coleman*,[43] and related cases, where evidence of prior possession of a weapon was admitted under (*William*) *Johnson* to show the defendants had possessed the weapons used in the charged crimes.  Here, the evidence was relevant to show Najiy's mental state: that he possessed the gun "knowingly," which turns on when and how the gun came to be in his waistband on August 29.  Accordingly, the relevance that Najiy points out is precisely what the trial court had approved to show "knowledge," as permitted by *Drew*,[44] before the government advised that it would only introduce the evidence in rebuttal.  Therefore, any limiting instruction would

---

[42]  *See id.* at 1164.

[43]  *See supra* note 39.

[44]  *See supra* note 7; *see also Jackson v. United States*, 856 A.2d 1111, 1116 (D.C. 2004) ("Knowledge is widely accepted as a non-propensity purpose for which other crimes evidence may be admitted.").

have told the jury to consider the evidence in the same way the government suggested in its closing argument: to "decide if . . . Mr. Najiy possessed the firearm voluntarily [and thus knowingly] before he overdosed." Any error, therefore, did not affect Najiy's substantial rights.[45]

## V. Government's Rebuttal Argument

Finally, Najiy contends that the government's rebuttal argument constituted prosecutorial misconduct by suggesting that Taylor testified in support of Najiy because she was afraid of him and yet hoped he would marry her, as promised, after the case was over. Taylor joins this argument, asserting that the government's remarks were also prejudicial to her in that they impugned her honesty and motives in testifying. Because neither appellant objected to the government's arguments at trial, we again review for plain error and "will reverse [their] conviction[s] only if the misconduct so clearly prejudiced [their] substantial rights as to jeopardize the fairness and integrity of [the] trial."[46]

---

[45] *See* text accompanying *supra* note 36.

[46] *Portillo v. United States*, 62 A.3d 1243, 1257 (D.C. 2013); *see also* text accompanying *supra* notes 36 and 37.

In a rebuttal argument, "the prosecutor 'may not go beyond reasonable inference and engage in impermissible speculation.'"[47] We have recognized that "evidence concerning a witness' fear tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant . . . if [she] testifies."[48] Therefore, "argument by prosecutors about witness fear – especially fear of the defendants on trial – must be the limited exception rather than the rule" and thus is not permissible, "absent a factual basis for such a comment."[49] That said, however, such evidence "may be admissible where the witness has given conflicting statements."[50]

In (*Antonio*) *Johnson*,[51] the witness testified at trial that her earlier video-taped statement and grand jury testimony – that the defendant had confessed his involvement in the charged murder to her – had been completely fabricated. To

---

[47] *Id.* (quoting *Clayborne v. United States*, 751 A.2d 956, 969 (D.C. 2000)).

[48] *Simpson v. United States*, 877 A.2d 1045, 1048 (D.C. 2005) (quoting *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999)).

[49] *(Antonio) Johnson v. United States*, 17 A.3d 621, 627 (D.C. 2011) (brackets removed) (first quoting *Murray v. United States*, 855 A.2d 1126, 1133 (D.C. 2004); and then quoting *Simpson*, 877 A.2d. at 1048).

[50] *Id.* (quoting *Mercer*, 724 A.2d at 1184).

[51] *Id.* at 624.

the contrary, the government presented the witness's statements to the police indicating that the defendant had beaten her and threatened to kill her, which "provide[d] a sufficient evidentiary basis from which the prosecutor could suggest that [the witness's] grand jury testimony was the more credible testimony, and that the inconsistency in her testimony resulted from [the defendant's] presence in the courtroom."[52]

Here, as in (*Antonio*) *Johnson*, Taylor gave inconsistent statements about what happened on August 29 and how the gun came to be on Najiy's person. Also as in (*Antonio*) *Johnson*, where evidence suggested the defendant had beaten and threatened the witness, here the evidence at trial showed that in the past Najiy had held a knife to Taylor's neck during a fight, choked her, and threatened her. Thus, the government permissibly presented evidence of Najiy's alleged threats and assaults against Taylor to reconcile her inconsistent statements and argue the reasonable inference that Taylor's statements tended to be more exculpatory when Najiy was present in the courtroom. The government had a firm factual foundation to make such an argument based on Taylor's prior statements to police and parole officers, and in obtaining a restraining order against Najiy.

---

[52] *Id.* at 624, 627.

Nor does the rebuttal argument about Taylor's relationship with Najiy as a source of bias constitute prosecutorial misconduct.  In *Mercer*, we recognized that the witness and defendant's "intimate relationship that produced a child was relevant, as it tended to show bias."[53]  Similarly here, the prosecutor's comments about Taylor's bias favoring Najiy as the father and supporter of her child, as well as her romantic interest and hope of getting back together, was founded on evidence, not speculation, and thus was a permissible source for demonstrating her bias.

## VI.    Conclusion

For the foregoing reasons, we affirm Taylor's and Najiy's convictions.

*So ordered.*

---

[53]  724 A.2d at 1189.